UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HUNTAIR, INC. | ) |
| | ) |
| Plaintiff, | ) Case No. 07 C 6890 |
| | ) |
| vs. | ) The Honorable Judge Coar |
| | ) |
| CLIMATECRAFT, INC. | ) Magistrate Judge Denlow |
| | ) |
| Defendant. | ) |

**HUNTAIR, INC.'S OPENING BRIEF ON CLAIM CONSTRUCTION ISSUES**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 2

    I.    THE LEGAL STANDARDS FOR CLAIM CONSTRUCTION REQUIRE CONSULTING THE SPECIFICATION AND THE PROSECUTION HISTORY. ................................................................................................... 2

    II.    THE '046 PATENT ................................................................................. 5

        A.    CLAIMS 1 AND 15 REQUIRE A CONTROL SYSTEM, WHICH MAY BE MANUAL OR AUTOMATIC. ............................................ 6

            1.    THE SPECIFIC CONTROL SYSTEM OF CLAIM 1 OF THE '046 PATENT REQUIRES THAT FAN UNITS CAN BE TURNED ON AND OFF TO RUN THE SYSTEM AT NEARLY PEAK EFFICIENCY ....................................................... 9

            2.    THE SPECIFIC CONTROL SYSTEM OF CLAIM 15 OF THE '046 PATENT REQUIRES THAT THE SPEED OF THE FAN UNITS OF THE FAN ARRAY CAN BE CONTROLLED SO THAT THE SYSTEM RUNS AT NEARLY PEAK EFFICIENCY ...................................................... 10

        B.    EFFICIENCY ........................................................................... 11

            1.    THE CLAIM REFERS TO THE EFFICIENCY OF THE SYSTEM. .................................................................................. 11

            2.    THE TERM EFFICIENCY AS USED IN THE '046 PATENTS REFERS TO THE ENERGY REQUIREMENTS TO MEET THE DEMAND IN THE STRUCTURE ............................................................... 12

            3.    THE TERM EFFICIENCY IN THE '046 PATENT DOES NOT REFER TO THE STATIC EFFICIENCY AS ARGUED BY CLIMATECRAFT ............................................. 14

    III.    THE '775 PATENT ............................................................................... 15

# **TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL CASES**

*Acumed LLC v. Stryker Corp.,*
    483 F.3d 800 (Fed. Cir. 2007)...................................................................................................4

*AK Steel Corp. v. Sollac and Ugine*,
    344 F.3d 1234 (Fed. Cir. 2003)...................................................................................................8

*Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*,
    340 F.3d 1298 (Fed. Cir. 2003)............................................................................................3, 10

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.,*
    345 F.3d 1318 (Fed. Cir. 2003)...........................................................................................3, 5, 6

*Ecolab, Inc. v. Envirochem, Inc.*,
    264 F.3d 1358 (Fed. Cir. 2001).................................................................................................10

*Gemstar-TV Guide Int'l, Inc. v. ITC,*
    383 F.3d 1352 (Fed. Cir. 2004)...................................................................................................4

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
    424 F.3d 1324 (Fed. Cir. 2005)...............................................................................................4, 7

*Pfizer, Inc. v. Teva Pharm. USA, Inc.,*
    429 F.3d 1364 (Fed. Cir. 2005)...................................................................................................2

Phillips v. AWH Corp.,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc), *cert. denied,* 546 U.S. 1170 (2006).............2, 3, 4, 6

*Rexnord Corp. v. Laitram Corp.,*
    274 F.3d 1336 (Fed. Cir. 2001)...................................................................................................4

*S3 Inc. v. NVIDIA Corp.,*
    259 F.3d 1364 (Fed. Cir. 2001)...................................................................................................4

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996).....................................................................................................3

# INTRODUCTION

Huntair, Inc.'s ("Huntair") proposed claim constructions are based upon the plain and ordinary meaning of the claim language; they are supported by the intrinsic evidence; and they comport with the understanding of one of ordinary skill in the art. Huntair's proposed constructions are consistent with the patent specifications and prosecution histories as well as controlling principles of claim construction.

In contrast, the constructions proposed by Defendant ClimateCraft, Inc. ("ClimateCraft") lead the Court into clear legal error. ClimateCraft proposes long definitions that include numerous limitations that are not present in the claims. ClimateCraft argues for constructions that are inconsistent with the specification, the prosecution history, and the non-asserted claims.[1]

Plaintiff asserts various claims[2] of U.S. Patent Nos. 7,179,046 ("the '046 patent") (Exhibit A) and 7,137,775 ("the '775 patent") (Exhibit B) (collectively, "the patents-in-suit").[3] The patents-in-suit are directed to air handling systems that condition the air in large buildings. Air handling systems traditionally used an enormous single fan to move the air in the building. When these single fan systems were used, the fan unit (the motor and the fan) had to be sized to meet the greatest demand anticipated in the building – typically the demand created by either extreme hot or extremely cold. The motors used to drive these fan units are most efficient when they run at or near their maximum rated power (i.e., they are fully loaded). For most days during

---

[1] ClimateCraft will apparently present arguments that certain claim limitations are indefinite, and offer extrinsic evidence from its expert James Rice on a number of issues, most of which do not bear on claim construction. Huntair will address that evidence, if necessary, in its Reply Brief.

[2] Specifically, Huntair asserts claims 1, 6, 8, 9, 10, 12, 14 and 15 of the '046 patent and claims 1, 2, 4, 5, 6, 7, 9, 11, 12, 14 and 15 of the '775 patent.

[3] In addition to the exhibits attached to this brief, Huntair reserves the right to rely upon additional exhibits at the *Markman* hearing. These exhibits will be submitted in accordance with this Court's Standing Order No. 7 "Procedures for Markman Hearing."

the year, the demand in the building is not near the extreme cold or hot conditions that the system was designed to handle. As a result the fans turn at lower speeds, and the motor runs at a small percentage of its rated power. Thus, the fan motor does not run at near its peak efficiency for most of the year.

The patents-in-suit are directed to fan array systems – where the large single fan is replaced by multiple smaller fans. The patents teach that replacing large fans with arrays of smaller fans provides a number of benefits, including a decrease in system size, ability to operate the system at increased efficiency, ease of replacement, and sound attenuation. Additionally, the patents teach, contrary to the conventional thinking in the field at the time these patents were filed, that these benefits can be realized without sacrificing system performance.

The patents-in-suit focus on one benefit of the fan array approach: the ability to control the fans to operate the air handling system at increased efficiency. A fan array coupled with an appropriate control system allows the user to run fewer fans and motors at full load when the demand in the structure is such that all of the fans are not needed. This "fine-tuning" of the fan array allows the user to turn off fans when they are not needed thus maintaining optimal motor efficiency and lower power consumption. The patents-in-suit are directed to fan array systems that achieve those benefits.

**ARGUMENT**

**I.     THE LEGAL STANDARDS FOR CLAIM CONSTRUCTION REQUIRE CONSULTING THE SPECIFICATION AND THE PROSECUTION HISTORY.**

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc), *cert. denied,* 546 U.S. 1170 (2006) (internal quotations omitted). "When interpreting claims, we inquire into how a person of ordinary skill in the art

would have understood claim terms at the time of the invention." *Pfizer, Inc. v. Teva Pharm. USA, Inc.,* 429 F.3d 1364, 1372-73 (Fed. Cir. 2005) (citing *Phillips*, 415 F.3d at 1313). The Court presumes that claim terms carry their ordinary and customary meaning to a person of skill in the art, but construes each term "in the context of the particular claim in which the disputed term appears." *Phillips*, 415 F.3d at 1313; *see Arlington Indus., Inc. v. Bridgeport Fittings, Inc.,* 345 F.3d 1318, 1325 (Fed. Cir. 2003).

"[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips,* 415 F.3d at 1313. The specification is "always highly relevant" in claim construction and is usually dispositive (*id.* at 1315, citation omitted), but limitations should not be read from the specification into the claim. *Id.* at 1323; *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306 (Fed. Cir. 2003). The specification, after all, is intended to "enable those of skill in the art to make and use the invention and to provide a best mode for doing so." *Phillips,* 415 F.3d at 1323. It is not expected that "persons of ordinary skill in the art…would confine their definitions of terms to the exact representations depicted in the embodiments" set forth in the specification. *Id.* Rather, "[t]he specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

ClimateCraft seeks to restrict the claims to the exact embodiments disclosed in the specification. But "[w]e do not import limitations into claims from examples or embodiments appearing only in a patent's written description, unless the specification makes clear that 'the patentee…intends for the claims and the embodiments in the specification to be strictly

3

coextensive.'" *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005) (quoting *Phillips,* 415 F.3d at 1323).  Even when a patent discloses only a single embodiment in the specification, the claims of the patent need not be construed as being limited to that embodiment.  *Gemstar-TV Guide Int'l, Inc. v. ITC,* 383 F.3d 1352, 1366 (Fed. Cir. 2004).  The examples described and illustrated in the specification are intended to be just that – examples, not claim limitations.  As the Federal Circuit has long held, "[s]pecifications teach.  Claims claim."  *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1344 (Fed. Cir. 2001) (quotation omitted).

Indeed, by providing a detailed disclosure in the specification, Huntair was "not narrowly defining the term[s] [at issue] or otherwise limiting the claims, but merely discharging [its] statutory duties 'to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so.'"  *Acumed LLC v. Stryker Corp.,* 483 F.3d 800, 809 (Fed. Cir. 2007) (quoting *Phillips*, 415 F.3d at 1323); *see also, S3 Inc. v. NVIDIA Corp.,* 259 F.3d 1364, 1369 (Fed. Cir. 2001) ("The purpose of claims is not to explain the technology or how it works, but to state the legal boundaries of the patent grant.").  The "preferred embodiment cannot be the only product covered by the claims; if it were, the claims themselves would be unnecessary."  *Acumed,* 483 F.3d at 809.  The claims in the patents-in-suit should not now be limited to the preferred embodiments, as ClimateCraft proposes.  To do so would be directly contrary to a major tenet of claim construction and clearly be improper.

In addition to consulting the specification in construing the claims, the Court should also consider the patent's prosecution history.  *Phillips*, 415 F.3d at 1317.  "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and where the invention limited the invention."  *Id.*

4

The intrinsic record, comprising the claims, the specification, and the prosecution history, must be examined in every case to determine whether the presumption of ordinary and customary meaning of a disputed claim term is rebutted. *Arlington,* 345 F.3d at 1325-26. As will be more fully explained below, each of these sources supports the claim construction proposed by Huntair.

## II.    THE '046 PATENT

Huntair is asserting independent claims 1 and 15 from the '046 patent:

Claim 1. A fan array fan section in an air-handling system comprising:

    (a)    an air-handling compartment;

    (b)    a plurality of fan units;

    (c)    said plurality of fan units arranged in a fan array;

    (d)    said fan array positioned within said air-handling compartment;

    (e)    said air-handling compartment associated with a structure such that said air-handling system conditions the air of said structure; and

    (f)    a control system for operating said plurality of fan units at substantially peak efficiency by strategically turning on and off selective ones of said plurality of fan units.

('046 patent, col.12 ll.5-18.)

Claim 15. A fan array fan section in an air-handling system comprising:

    (a)    an air-handling compartment;

    (b)    a plurality of fan units;

    (c)    said plurality of fan units arranged in a fan array;

    (d)    said fan array positioned within said air-handling compartment;

    (e)    said air-handling compartment association with a structure such that the said air-handling system conditions the air of said structure; and

>     (f)     a control system for controlling said plurality of fan units, said control system allowing control of the speed of the fan units in said plurality of fan units such that they run at substantially peak efficiency.

(*Id.* at col.13 ll.13-26.)  Although there are some minor disagreements among the parties on other terms, the primary disputes are whether the claimed control system requires automatic control, and the proper definition to be given to the term "efficiency."[4]

### A. CLAIMS 1 AND 15 REQUIRE A CONTROL SYSTEM, WHICH MAY BE MANUAL OR AUTOMATIC.

Claims 1 and 15[5] require a "control system" as defined in the individual asserted claims.  The patent specification describes several embodiments of the control system, including embodiments where the fan array is controlled by an automatic system, as well as control systems generally that contemplate manual or automatic control.  ClimateCraft seeks to read limitations from the preferred embodiment of the '046 patent into the definition of "control system."  This imports an automatic control limitation into the claims.  ClimateCraft's suggestion that the specification defines "control system" as requiring an array controller is without merit.

Claim terms carry their ordinary and customary meaning, and each term must be construed "in the context of the particular claim in which the disputed term appears."  *Phillips*, 415 F.3d at 1313; *Arlington*, 345 F.3d at 1325.  The plain language of the claim does not mention or suggest automatic control of the fans.  The claim simply recites a control system that enables control of certain characteristics of the fan array.  Thus, the plain meaning of the claim term does not require that the control system be "automatic."

---

[4] Huntair has attached a chart as Exhibit C that compares all of the claim terms that are disputed by the parties.
[5] The claims that depend from claims 1 and 15 also contain this limitation.

6

To be sure, the specification of the '046 patent describes a preferred embodiment for the control system that is capable of automatic control of the fan array, and refers to these controllers as "array controllers":

> In the preferred embodiment, each of the fan units 200 in the fan array fan section is controlled by an array controller 300 (FIGS. 13 and 14) that may be programmed to operate the fan units 200 at peak efficiency. In this peak efficiency, rather than running all of the fan units 200 at a reduced efficiency, the array controller 300 is able to turn off certain fan units 200 and run the remaining fan units 200 at peak efficiency.

('046 patent, col.6 ll.60-67.) Thus, the <u>preferred embodiment</u> of the control system is the automatic array controller described in this portion of the specification. ClimateCraft seeks to construe the claim term "control system" as requiring the automatic control that the specification attributes as the preferred embodiment. Absent a clear statement that the inventor intended the invention to be limited to the preferred embodiments, however, courts should not limit the claims to the preferred embodiment. *JVW Enters.*, 424 F.3d at 1335 (quoting *Phillips,* 415 F.3d at 1323). There is nothing in the specification of the '046 patent indicating that the claims are limited to the preferred embodiment.

The specification describes a control system where the control system may *optionally* include the automatic array controller of the preferred embodiment:

> A control system (that may include the array controller 300) would be used to take fan units 200 on line (an "ON" fan unit 200) and off line (an "OFF" fan unit 200) individually.

('046 patent, col.7 ll.12-15.) Thus, the inventor identified the array controller as just one possible example of the "control system," and confirmed that the control system need not be automatic.

A person of ordinary skill in the art would readily understand when reading the '046 patent that the fan array could be controlled manually (i.e., through a person selecting how many fans to operate), or through an automatic control mechanism that automatically determined

7

how many fans to operate (Exhibit F, Affidavit Regarding Fan Array Claim Construction, ¶ 14). More importantly, the specification specifically describes a person using the control system to determine how many fans in the array to operate:

> For example, in the 5x5 fan array such as that shown in FIGS. 5, 13 and 14, **a person desiring to control the array may select** desired air volume, a level of air flow, a pattern of air flow, and/or **how many fan units 200 to operate**.

('046 patent, col.7 ll.4-7 (emphases added).)

The prosecution history of the '046 patent also supports reading the claim terms "control system: and "array controller" to mean different things. The inventor specifically told the patent examiner during prosecution that the term "control system" was intended to be broader than the term "array controller":

> Claim 1 has been amended to replace the phrase 'array controller programmed to operate' with the phrase 'control system for operating.' **The new phrase is broader than the former phrase**.

(Exhibit D, Prosecution History of '046 Patent, at H000583.) The inventor also pointed out to the patent examiner that support for the broader claim term could be found at the portion of the specification identified above. ('046 patent, col.6 ll.12-15; *see* Prosecution History of '046 Patent, at H00583, H000117.) The prosecution history supports the fact that the "control system" is not limited to an automatic system.

Furthermore, the doctrine of claim differentiation compels the conclusion that the term "control system" is not synonymous with the term "array controller" in claim 1. *AK Steel Corp. v. Sollac and Ugine*, 344 F.3d 1234, 1242 (Fed. Cir. 2003) ("Under the doctrine of claim differentiation, dependent claims are presumed to be of narrower scope than the independent claims from which they depend.") Unasserted claim 2 depends from claim 1, and adds the

8

limitation that the control system is the programmable array controller of the preferred embodiment:

> The fan array section of in an air-handling system of claim 1, wherein said control system comprises a programmable array controller.

('046 patent, col.2 ll.2-21.) Thus, adopting ClimateCraft's definition of "control system" results in a dependent claim that adds no substance to the independent claim. This provides more evidence that the term "control system" includes, but is broader than, a system subject to automatic control.

While the two independent claims of the '046 patent both claim a control system, they claim different aspects of the control system. The specific way that the control system is claimed in each of the claims is discussed below.

> **1.   THE SPECIFIC CONTROL SYSTEM OF CLAIM 1 OF THE '046 PATENT REQUIRES THAT FAN UNITS CAN BE TURNED ON AND OFF TO RUN THE SYSTEM AT NEARLY PEAK EFFICIENCY.**

Claim 1 requires "a control system for operating said plurality of fan units at substantially peak efficiency by strategically turning on and off selective ones of said plurality of fan units." The parties offer drastically different constructions for these terms:

| Huntair's Proposed Construction of the Control System of Claim 1 | ClimateCraft's Proposed Construction of the Control System of Claim 1 |
|---|---|
| a system for operating the fan units at nearly peak efficiency by strategically turning on and off selective ones of the fan units by using a manual or automatic control | a control system that (a) receives input information regarding the system air flow requirements, (b) determines the output information necessary, i.e. which fans to turn on and off, and when, to achieve "substantially" peak efficiency of the fan units, and (c) produces the output information (i.e. sends a signal to turn individual fans on and off so that the fan units run at "substantially" peak efficiency |

9

As discussed above, the claimed control system may be subject to automatic or manual control.[6] The plain meaning of the claim language indicates that the control system can be used to selectively turn fan units off so that the fan units run at nearly peak efficiency.[7] ClimateCraft's proposed construction adds numerous limitations that are not present in the claims, and add significant complexity that is not supported by the specification.

2. **THE SPECIFIC CONTROL SYSTEM OF CLAIM 15 OF THE '046 PATENT REQUIRES THAT THE SPEED OF THE FAN UNITS OF THE FAN ARRAY CAN BE CONTROLLED SO THAT THE SYSTEM RUNS AT NEARLY PEAK EFFICIENCY.**

Claim 15 claims a different aspect of the control system. The claim requires "a control system for controlling said plurality of fan units, said control system allowing control of the speed of the fan units in said plurality of fan units such that they run at substantially peak efficiency." The parties again offer different constructions for these terms:

| Huntair's Proposed Construction of the Control System of Claim 15 | ClimateCraft's Proposed Construction of the Control System of Claim 15 |
|---|---|
| a system for operating the fan units at speeds achieving nearly peak efficiency by using a manual or automatic control | a control system that makes possible control of the fan units by (a) receiving input information regarding the system air flow requirements, (b) determining the output information necessary, i.e. which fans to speed or slow relative to the others, and when, to achieve "substantially" peak efficiency of the fan units, and (c) producing that output information (i.e. sends a signal to speed or slow individual fans) |

---

[6] ClimateCraft will apparently argue that the term "substantially" is indefinite, and incapable of being understood. As numerous courts have held, the term "substantially" should be construed to mean nearly, the plain and ordinary meaning of the term. *See. e.g.*, *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) ("We note that like the term 'about,' the term 'substantially' is a descriptive term commonly used in patent claims to avoid a strict numerical boundary to the specified parameter.") (internal citations and quotations omitted); *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1310-11 (Fed. Cir. 2003) ("While the term 'generally parallel,' as the district court noted, is mathematically imprecise, we note that words of approximation, such as 'generally' and 'substantially,' are descriptive terms commonly used in patent claims to avoid a strict numerical boundary to the specified parameter . . . In this case, exact parallelism is sufficient, but not necessary, to meet the limitation of the claim term 'generally parallel.'"(internal citations and quotations omitted).

[7] The term "efficiency" is discussed below.

10

|  | so that the fan units run at "substantially" peak efficiency |
|---|---|

The plain meaning of the claim language indicates that the claimed control system of claim 15 can be used to control the speed of the fans in the fan array such that the system operates at nearly peak efficiency.[8] Once again, ClimateCraft's proposed construction adds numerous limitations that are not present in the claims, and are not supported by the specification. For example, there is nothing in the language of the claim, nor the body of the specification, that requires a limitation that the control system be able to control the speed of individual fans.

### B.   EFFICIENCY

The parties' proposed definitions of the term "efficiency" are shown below.

| Huntair's Proposed Construction | ClimateCraft's Proposed Construction |
|---|---|
| the ratio of power delivered by the fans to the electrical power consumed by the fans | the maximum achievable static efficiency for a fan unit[9] |

The Court should adopt Huntair's construction since it is consistent with the context of the claim, comports with the way the term is used in the specification, and is consistent with the inventor's explanation of the term in the prosecution history. ClimateCraft again incorporates terms and restrictions into its construction that are inconsistent with the specification of the patent and the prosecution history, and ClimateCraft's proposed construction should therefore be rejected.

### 1.   THE CLAIM REFERS TO THE EFFICIENCY OF THE SYSTEM.

ClimateCraft seeks to limit the meaning of the term "efficiency" to the efficiency of an individual fan unit in the claimed fan array. The plain meaning of the term dictates that the claim is directed to the efficiency of the plurality as a whole, and not the efficiency of any given fan unit. In both asserted claims 1 and 15, it is the plurality of fan units as a whole that are

---

[8] Again, construction of the term efficiency is discussed in more detail below.
[9] ClimateCraft includes the term "peak" in its definition of the term "efficiency."

11

operated at nearly peak efficiency. The plain meaning of the claim term dictates that efficiency refers to the efficiency of the entire array, and not the efficiency of a fan unit in the array. Any other interpretation would make no sense, as the claims specifically contemplate that certain of the fans may be turned off by the control system. Fans that are not running are not "operating . . . at substantially peak efficiency" as they are not even in operation.

> **2. THE TERM EFFICIENCY AS USED IN THE '046 PATENTS REFERS TO THE ENERGY REQUIREMENTS TO MEET THE DEMAND IN THE STRUCTURE.**

The term "efficiency" as it is used in the claims of the '046 patent refers to the overall power efficiency of the fan array system in operation. As the inventor pointed out to the patent examiner during prosecution of the related '775 patent, "[m]otors are most efficient when nearly fully loaded. The fan wall allows the operator to turn off fans they are not needed thus maintaining optimal motor efficiency and lower power consumption." (Exhibit I, Declaration of Lawrence G. Hopkins, Mar. 15, 2005, at 3.) An air-handling system, such as that claimed in the '046 patent, is designed to meet the needs of the structure as demanded at any given time period. Because the needs of the system will change over various time periods, the system must be designed to meet the maximum anticipated demands that will be placed on it. Because the structures for which these systems are designed are typically large, and the conditions in which they must function vary to opposing extremes, in actual practice the maximum anticipated demand is rarely, if ever, reached. In a single fan system, therefore, the motor and fan must be sized such that the motor can meet the requirements under the most severe demand conditions. Therefore, the motor would only be running fully loaded when the operating requirements of the structure were very near the maximum design criteria for the structure. When the operating requirements for the structure decrease (which is a more normal mode of operation), the load on

the motor necessarily decreases, and the motor operates at a slower speed. The specification describes how the fan array solves this problem in efficiency:

> Since efficiency of the fan wall array can be optimized over a wide range of flow rates and pressures, the actual operating power can be consumed by the fan array is substantially less than the actual operating power consumed by the comparable prior art air-handling systems and the array controller's power could be reduced accordingly.

('046 patent, col.6 ll.36-41.) Thus, once the prior art single-fan system was designed and installed, the fan unit was operated to meet the demand in the structure regardless of whether or not the fan motor was running near its rated load, and regardless of the amount of power used to operate the motor at the necessary speed and horsepower. The fan array, on the other hand, allows more options, as the operator is able to run the array in various configurations to meet the demand, and run that system in an efficient manner to meet the demand in the structure.

The specification provides further context for the definition of efficiency as used in the claims of the '046 patent:

> The fan array section in the air-handling system of the present invention preferably are less expensive to operate than prior art air-handling systems because of greater flexibility of control and fine tuning to the operating requirements of the structure.
>
> * * *
>
> Using a control system to take fan units 200 on line and off line allows a user to control power usage and/or air flow.
>
> * * *
>
> The fan array fan section in the air-handling system of the present invention preferably is more efficient than prior art air-handling systems because each small fan unit 200 can run at peak efficiency. The system could turn individual fan units 200 on and off to prevent inefficient use of particular fan units 200.
>
> ('046 patent, col.9 ll.22-26; col.7 ll.19-20; col.9 ll.30-35.)

The term "efficiency" as it is used in the patents-in-suit refers to the power consumption of the array of fan units to meet the operating requirements of the structure. Expressed as a ratio, "efficiency" is the "ratio of the power delivered by the fan units, to the power consumed by the fan units." For any given demand in the system, the power delivered by the fan units will be constant, the efficiency is driven by choosing the number of fan units in the array that draws the least power while meeting the stated demand.

### 3. THE TERM EFFICIENCY IN THE '046 PATENT DOES NOT REFER TO THE STATIC EFFICIENCY AS ARGUED BY CLIMATECRAFT.

ClimateCraft's incorporation of the term "static" into its definition of "efficiency" is improper. Static efficiency is a term used in the field to refer to efficiencies associated with performance characteristics of fan blades and fan geometries. The patent specification makes multiple references to the word efficiency, but only one specific reference to the term "static efficiency." The term static efficiency in the specification refers to the ability of the fan array to provide more uniform air flow, resulting in a smaller housing for the fan array than prior art systems:

> This can also be described as higher static efficiency in that the present invention eliminates the need for settling means downstream from the discharge of a prior art fan system because there is little or no need to transition from high velocity to low velocity.

('046 patent, col.8 ll.11-16.) The specification does not refer to static efficiency to describe the benefits associated with turning fans on and off, or controlling the speed of the fans. It uses the term "static efficiency" to refer to the benefits associated with uniform air flow produced by the array and the associated benefits in space savings for the air-handling unit. (*See id.* at col.7 ll.57 - col.8 ll.19.) ClimateCraft's importation of the "static" limitation is improper, and should be rejected.

14

**III.    THE '775 PATENT**

Huntair construes the terms of the '775 consistently with the similar terms of the '046 patent. Claim 1 of the '775 patent includes the limitation "an array controller for controlling said at least six fan units to run at substantially peak efficiency by strategically turning selective ones of said at least six fan units on and off."[10] Huntair construes this claim limitation to mean "an automatic system that operates the at least six fan units at nearly peak efficiency by strategically turning on and off selective ones of the fan units."

As discussed above, the specification of the '775 patent[11] describes the array controller as the preferred embodiment of the control system. ('775 patent, col.6 ll.19-21.) The array controller may be programmed to operate the fan array by turning off certain fans in the fan array. (*Id.* at col.7 ll.42-55.)

---

[10] Although ClimateCraft proposes a construction for the remainder of the terms in this clause as shown in Exhibit C, it is Huntair's position that the remainder of the clause is clear in light of the other claim terms construed by the Court, and that no further construction of those terms is necessary.

[11] The specifications of the two asserted patents is nearly identical.

15

Dated: July 3, 2008                                                      Respectfully submitted,


     /s/ Richard T. McCaulley Jr.    
David T. Pritikin
Richard T. McCaulley Jr.
Stephanie P. Koh
Nicole E. Kopinski
Benedict F. Frey
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
Telephone:    (312) 853-7000
Facsimile:    (312) 853-7036
dpritikin@sidley.com
rmccaulley@sidley.com
skoh@sidley.com
nkopinski@sidley.com
bfrey@sidley.com

Carrie W. Cotter
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone    (415) 772-1200
Facsimile    (415) 772-7400
ccotter@sidley.com

*Attorneys for Plaintiff Huntair, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of July, 2008, I caused a copy of the foregoing document, HUNTAIR, INC.'S OPENING BRIEF ON CLAIM CONSTRUCTION ISSUES, to be served by ECF upon:

>Charles C. Kinne
>KINNE IP GROUP
>1240 Iroquois Avenue
>Suite 204
>Naperville, IL  60563
>Telephone:     (630) 904-0940
>Facsimile:     (888) 887-7158
>ckinne@kinnelaw.com
>
>*Attorney for Defendant ClimateCraft, Inc.*

>　/s/ Richard T. McCaulley Jr.
>Attorney for Plaintiff